**FILED**

1          UNITED STATES DISTRICT COURT    JUL 2 5 2002

UNITED STATES DISTRICT COURT
2                DISTRICT OF ALASKA    DISTRICT OF ALASKA
By_____ Deputy

3    UNITED STATES OF AMERICA,    )   Case No. A02-0031-CR (JWS)
                                  )
4                  Plaintiff,     )   Anchorage, Alaska
                                  )   Monday, April 15, 2002
5          vs.                    )   3:26 o'clock p.m.
                                  )
6    ROBERT A. LONG,              )   **BAIL REVIEW HEARING**
                                  )
7                  Defendant.     )
     _____)

8

9                    TRANSCRIPT OF PROCEEDINGS

10       BEFORE THE HONORABLE A. HARRY BRANSON
              UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiff:              JOSEPH W. BOTTINI, ESQ.
                                     Assistant U.S. Attorney
13                                   U.S. Attorney's Office
                                     222 West 7th Avenue, Room 253
14                                   Anchorage, Alaska   99513
                                     (907) 271-5071
15

16   For the Defendant:             MICHAEL DIENI, ESQ.
                                     Assistant Federal Public
17                                       Defender
                                     550 West 7th Avenue, Suite 1600
18                                   Anchorage, Alaska   99501
                                     (907) 646-3400
19
     Probation Officer:             TRAVIS LYONS
20                                   U.S. Pretrial Services/
                                         Probation Office
21                                   222 West 7th Avenue, #48
                                     Anchorage, Alaska   99513
22                                   (907) 271-5494

23   Court Recorder:                DEBBY W. LYONS
                                     U.S. District Court
24                                   222 West 7th Avenue, #4
                                     Anchorage, Alaska   99513
25                                   (907) 677-6151

TRANSCRIPT LOCATED IN EXPANDO FILE

**TRANSCRIPTS**
Bismarck, ND 58502
(...) 223-2096

EXHIBIT _B_
Page _1_ of
_13_ Pages

Bencardino – Direct                                        44

1          THE CLERK:  Sir, would you please raise your right

2    hand?

3          THE WITNESS:  Okay.

4       **LOUIS BENCARDINO, DEFENDANT'S WITNESS, SWORN**

5          THE CLERK:  Thank you, sir.  For the record, please

6    state your full name, spelling your last name, with your cur-

7    rent address.

8          THE WITNESS:  Louis A. Bencardino, B-e-n-c-a-r-

9    d-i-n-o.  And I -- my mailing address is Box 2064, Seward,

10   Alaska, and my living address is 1103 Second Avenue, Seward.

11         THE CLERK:  Thank you, sir.

12                    **DIRECT EXAMINATION**

13   BY MR. DIENI:

14   Q    Mr. Bencardino, this is Mike Dieni.  We've spoken several

15   times before this hearing, is that correct?

16   A    Yes.

17   Q    All right.  I'm the attorney that's representing Robert

18   Long, also known as Trapper.  I wanted to basically get a lit-

19   tle of your background into the record.  Have you worked in

20   law enforcement, sir?

21   A    Yes, I have.

22   Q    And -- and can you describe that background for us?

23   A    Well, I got over twenty years as Chief of Police.

24   Q    Where did you work as Chief of Police?

25   A    Seventeen years in Seward, two and a half years as Chief

EXHIBIT _B_
Page _2_ of
_13_ Pages

Bencardino - Direct                                45

1    of Palmer, and a year and a half up in Nome, and I was on the

2    police department in Fairbanks in the early sixties.

3    Q    All right.  How -- how recent -- how recently has it been

4    that you -- you -- you went away from police work?

5    A    October ninety-one is when I retired.

6    Q    How long had you been in Seward at that time?

7    A    When I retired?

8    Q    Right.

9    A    Seventeen years.

10   Q    Okay.  And have you continued to reside in Seward since

11   then?

12   A    Yes.

13   Q    Okay.  And -- and what kind of work have you done in

14   Seward since 1991?

15   A    I was consultant to the Chugiak Native Corporation for a

16   couple of years and then -- then I worked for the Alaska Rail-

17   road part-time, then I went on full-time -- went on just about

18   three years ago.

19   Q    Have you gauged -- have you engaged in any additional

20   public service in Seward --

21   A    Yes.

22   Q    -- since retiring as a police officer?  What -- what is

23   that, sir?

24   A    I -- right after I retired, two months later I was a -- a

25   councilman for three years, then I was mayor for two years,

10118

EXHIBIT B
Page 3 of
13 Pages

Bencardino – Direct                46

1  and, you know, of course from then on I'd been working for

2  Chugiak and then Alaska Railroad.

3  Q    What -- and what do you do for the railroad right now?

4  A    I'm the dock manager for Seward and Whittier.

5  Q    All right.  And you've met Trapper?

6  A    Oh, yes.

7  Q    How long have you known Trapper?

8  A    Oh, somewheres around a year and a half, maybe two years.

9  Ever since he start coming into the coffee shop.

10  Q    All right.  I take it you're a regular at the Marina

11  Café?

12  A    Yes, I stop in there every day just about.

13  Q    Okay.  And so I take it you've had a chance to -- to meet

14  Trapper and talk to him and -- and that sort of thing?

15  A    Oh, yes.

16  Q    Now you I imagine as a police chief have undertaken to

17  try to size up individuals?

18  A    Yes.

19  Q    All right.  And have you formed any opinion about Trapper

20  as far as his potential for violence in -- in your view?

21  A    I don't think he's a violent type person.  I know he

22  talks a lot and -- I mean also uses the computer a lot.  In

23  fact, I just had my lieutenant here -- he's retired, too --

24  and we were just talking about him and neither one of us felt

25  that he's a -- a threat to the community as far as being a'

EXHIBIT B
Page 4 of
13 Pages

10119

Bencardino - Direct                    47

1   person that would commit murder or anything like that.

2   Q    So if the Court decided to -- so you'd be comfortable if

3   the Judge decided to let him go back to Seward pending trial

4   of these -- of these charges?

5   A    I wouldn't have no problems with that.

6   Q    Now I've volunteered you to be a what we might call an

7   oversight third-party custodian where you would check on -- on

8   Trapper on a daily basis.  Are you willing to do that?

9   A    Yeah, if Trapper's willing to do that 'cause, you know, I

10  could be his worst enemy.  I won't put up with any guff or

11  anything.  If he steps over the line, then I'll get a-hold of

12  the probation officer, which I talked to him last -- I think

13  it was Friday -- too, and I promised him that's what I would

14  do.

15  Q    Now I -- I faxed you a bunch of the papers that the pros-

16  ecutor's relying upon --

17  A    Right.

18  Q    -- for bringing these charges.  You've had a chance to

19  read those?

20  A    Yes, I just let my lieutenant read them, too.

21  Q    Okay.  So it's clear that Mr. -- to you that Mr. Long has

22  popped off in some -- some written work to the Court.  You've

23  seen that?

24  A    Yes.

25  Q    Okay.  And having read that, you -- you're still satis-

EXHIBIT B
Page 5 of
13 Pages

Bencardino - Direct/Cross                                    48

1    fied that -- that if he's released to third-party custody in

2    the City of Seward, you don't believe he's going to be a dan-

3    ger to the community?

4    A    No.

5         MR. DIENI:  All right.  Those are my questions.

6    Thank you, sir.

                    CROSS-EXAMINATION

8    BY MR. BOTTINI:

9    Q    Mr. Bencardino, good afternoon.

10   A    Yes.

11   Q    My name is Joe Bottini, I'm an Assistant U.S. Attorney

12   here in Anchorage and I'm the prosecutor assigned to the case.

13   A    Yeah, Joe, go ahead.

14   Q    Have you -- you mentioned that you'd read some things

15   that Mr. Dieni sent to you.  Did those include pleadings that

16   Mr. Long appeared to have prepared and filed in the U.S. Dis-

17   trict Court?

18   A    I got -- God, I don't know, twenty-some pages here.

19   Q    Okay.  Let me -- let me ask you if you've got those -- do

20   you have those in front of you?

21   A    Yes.

22   Q    Okay.  There's one that's -- it's a -- it's a pleading

23   that's titled -- (clearing throat) excuse me -- "Motion Three:

24   Declaration to the Court, Motion to Inform the Court of the

25   State of Plaintiff and Intent of Plaintiff," and there's a

EXHIBIT B
Page 6 of
13 Pages

Bencardino - Cross                                    49

1  file stamp on the upper right-hand corner that says October 3,

2  2001.  Do you have -- do you have that one in front of you?

3  A    October 3 -- April -- April --

4                    (Pause)

5  October 3, 2001.  The one that was filed in the County of Los

6  Angeles?

7  Q    Yeah, Robert A. Long versus County of Los Angeles --

8  A    Yeah.

9  Q    -- is the case caption --

10  A    Yes.

11  Q    -- and the -- the title of the pleading, it says "Motion

12  Three:  Declaration to the Court, Motion to Inform the Court"?

13  A    Yeah.  I've got it.

14  Q    Okay.  All right.  In that pleading, Mr. Long -- I'll

15  represent to you that Mr. Long has admitted that he in fact

16  prepared this pleading.  Mr. Long is referring to an encounter

17  that he had with a Seward police officer who had pulled him

18  over, and you'll see that episode described beginning on page

19  two of that pleading.

20  A    Mm-hmm (affirmative).

21  Q    Okay.  And then you go down to the fourth paragraph and

22  Mr. Long stays this:

23            "Plaintiff admits that this officer lives today only

24            due to this lie; that without this lie, only a bul-

25            let hole in the face would have met this officer, as

NoDak Rose Transcripts
P.O. Box 1752 ✦ Bismarck, ND 58502
(701) 223-2096

EXHIBIT _B_
Page _7_ of
_13_ Pages

1          will meet the next armed lying piece of government

2          shit to face and confront plaintiff in aid of the

3          criminal State of Alaska."

4    You see that?

5    A    Yes, I do.

6    Q    Okay.  That's a pretty -- a pretty direct threat that Mr.

7    Long is conveying there, isn't it?

8    A    Yeah, I -- I would -- yeah, if you were -- if you didn't

9    know him and you saw that, I would say it probably would be.

10   Q    Well, let me -- let me ask you this.  When you were the

11   Chief of Police in Seward, if someone had dropped that off

12   let's say at the police department, what would you have done

13   with it?

14   A    I would have called him in.

15   Q    'Kay.  Did you know that two Deputy United States Mar-

16   shals went down to Seward last October and interviewed Mr.

17   Long on October the 5th?

18   A    Yes, I do.

19   Q    Okay.  And did you know what Mr. Long said to them while

20   they were down there?

21   A    I don't know what the exact words were, no.

22   Q    Okay.  Did -- did -- were you aware that Mr. Long said

23   words to the effect of his back is up against the wall and

24   that he expected that they were -- they were going to come

25   some day and have to -- to do their jobs and he was going to

EXHIBIT _B_
Page _9_ of
_13_ Pages

<u>Bencardino - Cross</u>                               51

1   have to do what he had to do and take three or four of them

2   with him? Did you know he said that to them?

3   A    I heard he made some comments -- something in that order,

4   but I didn't know exactly what it was, you know -- exact

5   words.

6   Q    Did you know that in that same conversation, Mr. Long

7   expressed empathy with Timothy McVeigh?

8            MR. DIENI:  Same objection.

9   A    What was that?

10           THE COURT:  Overruled.

11  BY MR. BOTTINI:

12  Q    Did you know that in that same conversation that he had

13  with the Deputy U.S. Marshals on October the 5th, that Mr.

14  Long expressed empathy with Timothy McVeigh?

15  A    You know, like I say, I -- I know Trapper, you know,

16  fairly well.  I don't know him like -- like a brother or any-

17  thing, but I -- I see him every day and bullshit with him and

18  stuff like that.

19  Q    Yeah.

20  A    I think Trapper would try to impress anybody just like he

21  does there sitting there at the -- at the counter there that

22  he knows the law, you know, and he knows the -- how to work

23  around it.  He tries to impress people that way.  I don't

24  think he is the type of person that -- that follows through

25  with what he says.  Now I've been around a long time and I've

1   been around guys like Trapper and some a lot worse, and I

2   don't -- you know, I don't get that feeling, and -- and I --

3   and I'm very good at that. When -- when I get a bad feeling

4   about somebody, you can bet that there's -- something's wrong,

5   and I don't get that around him. For some reason, I don't --

6   I know -- I've read these things, you know -- these papers

7   here and everything, but I just don't get that feeling around

8   him. And I could be wrong, I'm not saying I'm not -- you

9   know, it couldn't happen, but I would say that chances are

10  that Trapper likes to try to impress people --

11  Q    'Kay.

12  A    -- and just like he did try to do with me, and I just --

13  I mean, he wanted me to get involved in the -- some of these

14  actions, too. He asked me, and I said, nah, I don't think so,

15  and finished my coffee and left.

16  Q    Okay. It's -- it's fair to say that he's -- he's ex-

17  tremely frustrated with the judicial system, isn't that cor-

18  rect?

19  A    Yeah, he -- he's had his problems with them, I know that,

20  with that kid that he had -- I think it's down in California

21  or some place there, I know that was a -- something about it.

22  I know the police department backed off on him. They knew he

23  didn't have a driver's license, and they let him keep right on

24  going.

25  Q    Do you know whether it was because he threatened to shoot

EXHIBIT B
Page 10 of
13 Pages

1  a -- an officer in the face?

2  A    No.

3  Q    'Kay.  This -- this lawsuit that he has pending here in

4  -- in federal court, this -- this thing is pretty much an ob-

5  session with him, isn't it?

6  A    I would -- yeah, I'd -- I'd come -- yeah, seems like

7  that's all he does is sit there with that computer, you know,

8  and he's always responding to something in -- in the courts,

9  but -- and I -- I know where you're coming from.  I -- I -- I

10 -- you're doing your job, I can understand that, and -- and

11 not -- with you not being around him all the time, I can un-

12 derstand where you're coming from, and I can understand the

13 judge being leery, too, after some of the things he said, but

14 I -- but as far as I think this individual going out and

15 shooting people, those type of things, I don't think that's

16 going to happen.  You know, like I say, I'm just going by my

17 own gut feeling.

18 Q    Sure.  And let me ask you this, Mr. Bencardino.  In the

19 year, the year and a half that you've known Mr. Long, have you

20 ever had occasion to make him angry?

21 A    I think he was one time, he just didn't feel too comfort-

22 able about me because I turned him down --

23 Q    'Kay.  Was that --

24 A    -- but he didn't -- I mean he didn't get, you know, car-

25 ried away or anything with me.

EXHIBIT 5
Page 11 of
13 Pages

1   Q   Was that in relation to what you were describing a little

2   earlier, the -- he asked you to help him out here?

3   A   Yeah.

4   Q   Okay.  But certainly, you wouldn't say that he was as

5   frustrated with you on that occasion as he is with the federal

6   judicial system, would you?

7   A   No, I wouldn't say that, no.

8           MR. BOTTINI:  That's all the questions I have for

9   you.  Thanks.

10          THE COURT:  Any redirect?

11          MR. DIENI:  No, no redirect.  Thank you, Mr.

12  Bencardino.

13          THE COURT:  Thank you.

14          THE WITNESS:  Okay.  So --

15          MR. DIENI:  You can -- you can hang up now.

16          THE WITNESS:  Okay.

17          THE CLERK:  Thank you, sir.

18          MR. DIENI:  Judge, the proposed third-parties are

19  here.  Tina Crump, would you stand up and Kaye Eliason is her

20  mother.

21          THE COURT:  Go ahead.

EXHIBIT B
Page 12 of
13 Pages

1                             **INDEX**

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **WITNESSES FOR THE DEFENDANT:** | | | | | |
| Carla Goldsmith | 14 | 20 | | | |
| Bradley Snowden | 30 | 36 | | | |
| Louis Bencardino | 44 | 48 | | | |
| Tina Crump | 55 | 60 | 61 | | |
| Kaye Eliason | 66 | 68 | 70 | | |

Page

COURT'S RULING                                    71

12

13

14

15

16

17

18

19

20

21

10128

EXHIBIT B
Page 13 of 13 Pages